UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

```
DENNIS POTTS,                    )
                                 )
        Plaintiff,               )
                                 )
    v.                           )    Case No. 3:04-1147
                                 )    Judge Echols
                                 )
CENTEX HOMES,                    )
                                 )
        Defendant.               )
```

## MEMORANDUM

Pending before the Court is Defendant Centex Homes' Motion for Summary Judgment (Docket Entry No. 14) to which Plaintiff Dennis Potts ("Potts") has responded in opposition (Docket Entry No. 20) and Centex Homes has replied (Docket Entry No. 26).

### I. FACTUAL BACKGROUND

This is an action under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12201 *et seq.* and the Tennessee Handicap Act ("THA"), T.C.A. § 8-50-103 *et seq.*, in which Potts alleges his employment with Centex Homes was terminated because he was disabled or perceived as disabled by his employer. The relevant facts, which for present purposes must be construed in Plaintiff's favor, are as follows. These facts will be amplified where necessary for purposes of the legal analysis.

Centex Homes is a homebuilding subsidiary of Centex Corporation and has a division in Nashville. (Docket Entry Nos. 1 ¶ 12 & 3 ¶ 12). Potts began working for Centex Homes in its Nashville Division as a Field Manager on January 5, 1998. (Def.

1

SOF ¶ 1).[1] At all relevant times, Roger Vernon ("Vernon") was the Director of the Nashville Division of Centex Homes and his duties included managing the construction and warranty department for the division. (Id. ¶¶ 2-3). To accomplish those duties, Vernon spent half of his time in the office, and the other half of his time in the field. (Id.).

Vernon first met Potts in April of 2002 when Potts was a Field Manager Level III and Vernon was his supervisor. (Id. ¶ 5). The job duties of a Field Manager III are varied and range from scheduling to ensure that construction activities are completed as planned; managing contractors to ensure they adhere to plans and schedules; monitoring and maintaining the cleanliness and appearance of construction sites; interacting with potential customers; managing materials; and controlling costs. (Docket Entry No. 23 Ex. 1). The position also requires assorted physical activity including climbing onto and inspecting roofs, entering and exiting crawl spaces, inspecting attics, and climbing ladders. (Potts Depo. I[2] at 29).

Between May and December of 2002, Potts injured his back and shoulder and underwent two surgeries. During that period, he remained consistently employed at Centex Homes. (Def. SOF ¶¶ 6, 9-

---

[1] Where reference is made to the Statement of Facts ("SOF") of a party, that statement of fact is undisputed.

[2] Plaintiff was deposed three separate times, twice for worker's compensation claims he had filed and once in this case. Reference to the depositions in the worker's compensation cases are "Potts Depo. I" and "Potts Depo. II," while reference to the deposition taken in this case is "Potts Depo. III."

2

14). On March 19, 2003, Potts underwent neck surgery and had a second neck surgery in May of 2003. (<u>Id</u>. ¶¶ 15-16). Several weeks after the last surgery, Potts returned to work. However, on December 23, 2003, while lifting a garage door, Potts injured both shoulders.

Upon his return to work in early 2004, Potts was unable to climb on roofs, go into attics or crawl spaces, or climb ladders. He was, however, able to do other things such as make sure the schedules were being met and answer the phone. (Potts Depo. I at 29). Potts claims that he was allowed to do these limited duties because the subdivision he was overseeing was almost finished and he was assigned to help another employee finish up the last house. (Potts Depo. II at 24-25). Vernon claims that because of Potts' physical restrictions, Vernon discussed with Potts what could be done to make Potts a contributing Field Manager and it was determined that he could perform administrative tasks. (Vernon Depo. at 25).

This accommodation was temporary and eventually Vernon determined that Potts could not perform the job duties of a Field Manager and there were no reasonable accommodations which could be made that would allow Potts to remain as a Field Manager for Centex Homes. (Def. SOF ¶¶ 23 & 28).[3] Potts' employment with Centex Homes was terminated on March 15, 2004, after he met with Vernon,

---

[3]Vernon claims that prior to this decision he verbally told Potts that Potts was not performing his job to expectations. (Vernon Depo. at 20). Potts claims he was never informed that he was not meeting expectations. (Potts Aff. ¶ 9).

3

Wes Patterson ("Patterson") the Nashville Division President, and Ken Thompson ("Thompson") the Division Controller. (Potts Depo. III at 17; Patterson Depo. at 21).

At the time of Potts' termination, there were four jobs available at Centex Homes, Nashville Division: (1) Field Manager II; (2) Assistant Controller; (3) Sales Counselor; and (4) Quality Inspector. (Def. SOF ¶ 30). The position of Field Manager II and Quality Inspector have essentially the same job functions and include the ability to climb ladders, get on roofs, demonstrate various components of a home to potential homeowners, and enter into awkward physical positions. (Id. ¶¶ 32-33, 43). Potts was unable to climb on roofs or get into awkward spaces. (Id. ¶ 34).

The position of Assistant Controller required a college degree in business and two years of accounting experience and preferably previous experience in the field. Potts has a ninth grade education and has consistently been employed either as a truck driver or in the construction trades. (Id. ¶¶ 36-37). The position of Sales Counselor required one to sell new homes and demonstrate the working parts of a home, including opening doors and windows. (Id. ¶ 39). Although Potts had no sales experience and indicated in his deposition that he had not considered sales since he liked construction, in an affidavit, Potts states he would have done anything to stay with Centex Homes, including sales. (Potts Depo. I at 55; Potts Aff. ¶ 5).

4

Potts asserts that Centex Homes should have allowed him to have a "punch man"[4] to do the heavy labor portion of his job as a Field Manager. (Def. SOF ¶ 47). However, while Centex Homes previously used "punch men" to assist the Field Managers by doing some of the manual labor duties, Centex Homes has not employed any "punch men" since June 2002. (Id. ¶ 52). Accordingly, the Field Managers were sometimes called upon to perform the tasks if, for example, the subcontractor did not finish its job and could not be called back to the work site. (Vernon Depo. at 72).

As a result of his various injuries, Potts is unable to perform certain work and manual tasks. He has testified that he is unable to do yard work, use a boat, do home repairs, engage in water sports, lift his grandchild, lift a gallon of milk, operate a chainsaw, pull himself up into a truck, lift his arm above his shoulder, or lift the hood of a vehicle. (Potts Depo. I at 21-22, 80, 90, 101 & Potts Depo. III at 21, 28-34). Potts has also testified that he cannot change a flat tire, operate heavy equipment, do truck maintenance, or unhook a trailer. (Id.).

Apart from Potts' own testimony, Dr. Richard Fishbein ("Dr. Fishbein"), an orthopaedic physician, has opined that because of repeated injury to Potts' neck and shoulders, he has a thirty-three percent whole person impairment and should avoid all situations involving excessive neck straining, turning, and twisting. Additionally, Dr. Fishbein opined that Potts has

---

[4]A "punch man" is a trades person who can perform multiple, different crafts. (Def. SOF ¶ 48).

5

permanent restrictions, including lifting restrictions of 15 pounds maximum, ten pounds occasionally, and five pounds repetitively. (Dr. Fishbein Report at 2). Fishbein also believes, based upon a reasonable degree of medical certainty, that, as of the time of his termination, Potts was unable, or substantially limited in his ability to perform manual tasks and was substantially limited in his ability to work. (Fishbein Aff. ¶ 10).

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the

moving party shows an absence of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 325.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III.  LEGAL ANALYSIS

As indicated at the outset, Potts claims that he was terminated in violation of the ADA.  He also claims that his termination violated the THA.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Similarly, the THA provides that "[t]here shall be no discrimination in the hiring, firing and other terms and conditions of employment of . . . any private employer . . . based solely upon any physical, mental or visual handicap[.]"  Tenn. Code Ann. § 8-50-103(a). Because of the similarity of these statutes, "[a] claim brought under the THA is analyzed under the same principles as those utilized for the Americans with Disabilities Act ("ADA")."  Sasser v. Quebecor Printing (U.S.A.) Corp., 159 S.W.2d 579, 582 (Tenn. Ct. App. 2004).

7

**A.   Disability under the ADA**

Under the ADA, the term "disability" means "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). Major life activities are ""functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i).  One is "substantially limited" if he or she is "(1) unable to perform a major life activity that the average person in the general population can perform; or (2) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  29 C.F.R. § 1630.2(j)(1).

The determination as to whether an individual is substantially impaired in a major life activity is made as of the time that the adverse employment decision was made.  Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 884 (6th Cir. 1996).  With regard to the major life activity of working, a court is to "consider the manner in which a claimant's personal education and prior work experience limits his ability to pursue employment in other sections of the economy[.]" Burns v. Coca-Cola Enterprises, Inc., 222 F.3d 247, 254 (6th Cir. 2000).

In this case, Centex Homes asserts that Potts was not disabled because at the time of his termination he was able to perform all types of major life activities as evidenced by the fact that Potts

8

was able to get himself up, get ready for work, drive himself to the work site and work the full day. Centex Homes asserts that Potts' claim really is only that he could no longer work in the position of Field Manager and this is insufficient to allow recovery under the ADA.

The Sixth Circuit "has repeatedly held that the major life activity of working is not substantially limited simply because an employee's physical or psychological impairment prevents him from performing a particular job." <u>Agnew v. Heat Treating Services of America</u>, 2005 WL 3550532 at *5 (6th Cir. 2005)(collecting cases). "To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice." <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471, 491 (1999).

In this case, Potts has presented sufficient evidence to present a jury question as to whether he was substantially limited in the major life activity of working. Potts is significantly limited in his ability to lift – no more than 15 pounds maximum, ten pounds occasionally and five pounds repetitively. Dr. Fishbein states that these weight restrictions, coupled with Potts' limited ability to turn and twist and his overall 33% impairment, make him substantially limited in his ability to work.

Additionally, Potts, who has a ninth grade education and has worked his entire life as a truck driver or in the construction trades, is unable to climb ladders, lift garage doors, go onto roofs or into crawl spaces, lift the hood of a vehicle to check the oil, climb into the truck, or unhook trailers, among other things.

9

The restrictions placed upon Potts are within the realm of those found to present a jury question as to whether an individual is disabled. See Henderson v. ARDCO, Inc., 247 F.3d 645, 647 (6th Cir. 2001)(genuine issue for trial existed where plaintiff worked in manufacturing and was restricted from stooping, bending and lifting more than 25 pounds or 40 pounds frequently).

Quite apart from the major life activity of working, the record is replete with references to severe restrictions on Potts' ability to engage in manual tasks. In Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197 (2002), the Supreme Court considered whether a plaintiff's carpal-tunnel syndrome substantially limited the specific major life activity of performing manual tasks. The Court concluded that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." Id. at 198.

In his various depositions, Potts has testified that, among other things, he is unable to (1) weed or cut his yard, (2) tie up a boat; (3) do home repairs or renovations; (4) engage in water sports; (5) lift his grandchildren; (6) drive for long periods of time; (7) lift certain groceries; (8) operate a chain saw; (9) use his arms to pull himself into a truck; (10) lift the hood of a vehicle; (11) pick up a gallon of milk or lift his left arm above his shoulder. Potts' condition is not fleeting and a reasonable jury could conclude, based on this evidence and its own life experience, that Potts' difficulty in performing assorted manual tasks is a substantial limitation compared to the ability of most

10

people to perform the manual tasks essential in their daily lives. See, Hawkins v. George F. Cram Co., 397 F.Supp.2d 1006, 1019 (S.D. Ind. 2005)(jury question raised where Plaintiff had a 29% impairment of her hand and evidence suggested that employer viewed impairment as interfering with Plaintiff's ability to perform a number of household and self-care tasks); Lyman v. City of New York, 2003 WL 22171518 at *5-6 (S.D.N.Y. 2003)(sufficient evidence existed that employee substantially impaired in performing manual task where plaintiff averred that her lupus made her incapable of performing household chores, playing sports, and gardening and doctor stated plaintiff should refrain from any bending, pulling, pushing and lifting on job); Swiltala v. Schwan's Sales Enterprise, 231 F.Supp.2d 672, 682 (N.D. Ohio 2002)(plaintiff's inability because of back injury to do such things as string Christmas lights, wash windows, work on his car, cut or split wood, move furniture, mow or trim lawn, shovel snow, garden, and play sports raised a genuine issue about the impact of plaintiff's impairment on his ability to perform manual tasks). Accordingly, summary judgment will not be granted on the basis of Centex Homes' contention that Potts is not disabled within the meaning of the ADA.

**B. Reasonable Accommodation**

An employer discriminates under the ADA if it fails to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."

11

42 U.S.C. § 12112(b)(5)(A).[5] The "disabled individual bears the initial burden of proposing an accommodation and showing that the accommodation is objectively reasonable." Monette v. Electronic Data Sys. Corp., 90 F.3d 1173, 1183 (6th Cir.1996). The employer, however, bears the burden of persuasion on whether a proposed accommodation would impose an undue hardship. Id.

Centex Homes argues that assuming Potts was disabled within the meaning of the ADA, his claim would still fail since he could not perform the essential functions of the job even with a reasonable accommodation. Moreover, there were no available jobs for which Potts was qualified in the Nashville Division at the time of his termination.

As Centex correctly notes, the ADA does not require employers to create new positions for employees who can no longer perform the essential functions of their jobs. Smith v. Ameritech Publishing Inc., 129 F.3d 857, 867 (6th Cir. 1997). In this regard, Potts' suggestion that a "punch man" could have been employed to assist him must fail since it would impose a burden on Centex Homes not required by the ADA. Likewise, insofar as climbing onto roofs, inspecting roofs and attics, and doing punch list work were

---

[5] Even though the THA on its face contains no language requiring an employer to reasonably accommodate the disability of an employee, the Tennessee Supreme Court in Barnes v. Goodyear Tire & Rubber Co., 48 S.W.3d 698, 705 (Tenn. 2000) indicated that the THA covers qualified individuals with a disability who "can perform the essential functions of the job with or without reasonable accommodation."

12

essential functions of the job of a Field Manager III,[6] Centex Homes was not required to reallocate or eliminate those duties. See, Bratten v. SSI Services, Inc., 185 F.3d 625, 632 (6th Cir. 1999)("job restructuring within the meaning of the ADA only pertains to the restructuring of non-essential or marginal functions of the job").

Centex Homes also recognizes that in some cases a reasonable accommodation may include reassignment to a vacant position. Smith, 129 F.3d at 657. At the time of Potts' termination, there were four positions available in the Nashville Division: (1) Field Manager II; (2) Quality Inspector; (3) Sales Counselor; and (4) Assistant Controller. Centex Homes asserts that Potts could not perform the first three positions even with a reasonable accommodation and that he was unqualified for the position of Assistant Controller. Potts appears to concede as much by asserting that "defendants have demonstrated that the plaintiff was not eligible for other jobs in the Nashville Division on or about March 15th, 2005[.]" (Docket Entry No. 21 at 11).

Nevertheless, the Court's inquiry is not at an end because an employer's duty "to consider reassignment," Bratten, 185 F.3d at 634, includes the possibility of a transfer or relocation. See,

---

[6]There may be a question of fact as to whether all of these activities were essential functions of the job because the "Job Description" for Field Manager III is several pages in length and could be read to be more supervisory in nature since its objectives were to maintain construction schedules and budgets for each home and to provide a high standard of service to the customer. Vernon himself indicated that the job description was "pretty broad." (Vernon Depo. at 18).

13

E.E.O.C. v. UPS, Inc., 249 F.3d 557, 563 (6th Cir. 2001)(employer had "statutory duty to consider transfer as a reasonable accommodation" for disabled plaintiff); Sturm v. UAL Corp., 2000 WL 13000396 at *15 (D.N.J. 2000)("where, as here, the employee claims to be willing to relocate, the Court sees no reason why a transfer to a different city to a facility that has a permanent, vacant position for which the disabled employee is qualified could not be considered a reasonable accommodation"); Giles v. General Electric Co., 1999 WL 202573 at *4 (N.D. Tex. 1999)("request for relocation is reasonable in the run of cases").

In his affidavit, Potts states that as of the date of his termination he had a good working relationship with Centex Homes, and that he "desperately" wanted to remain employed by Centex Homes, even if that meant relocating to a different city or state. (Potts Aff. ¶¶ 4-6). Centex Homes claims that these contentions are "in direct contradiction in his deposition testimony" and points to the following exchange:

> Q: Have you looked at the possibility of taking jobs in other parts of the country that might have more availability for jobs, or do you pretty much want to stay in this area?
>
> A. Five children and nine grandkids, my wife wants to stay around here.
>
> Q. And if that's what your wife wants to do –
>
> A. Mama says it's so, it's so.

(Potts Depo. III at 22).

The foregoing excerpt is not necessarily in conflict with Potts' affidavit since the questioning related to whether Potts had considered taking jobs in other parts of the country where more

14

jobs might be available, not necessarily whether he would consider taking a job with Centex Homes elsewhere. Moreover, this questioning occurred after he was terminated from Centex Homes and says nothing about what his view may have been at the time of termination.

From all outward appearances, no one ever discussed the possibility of Potts taking an available job at other Centex Homes locations. (Thompson Depo. at 31; Patterson Depo. at 23). Indeed, the Personnel Action Notice gave the following explanation regarding the discharge:

> You are being terminated because you are unable to perform the essential functions of the available jobs in our *Nashville Division* and there are no reasonable accommodations that can be made.

(Patterson Depo. Ex. 2, emphasis added). For his part, Potts claims that no one ever asked him if he would be willing to relocate in order to remain employed with Centex Homes. (Potts Aff. ¶ 3). In fact, Potts claims that at some point he considered applying for a job with Centex Homes in Florida but Vernon discouraged him from doing so. (Id. ¶ 7).

Generally, "the reasonableness of an accommodation is an issue of fact." Berry v. City of Savannah, 1999 WL 196557 at * 4 (6th Cir. 1999). In this case there is a question of fact as to whether Potts was willing to relocate at the time of his termination. There is also a question of fact as to whether he could have worked at another Centex Homes' location since Patterson testified that there were two jobs which he could think of that Potts probably could have performed at Centex Homes, Estimator and Service

15

Coordinator. (Patterson Depo. at 15). Therefore, summary judgment is inappropriate on Centex Homes' contention that it could not reasonably accommodate Potts.

### IV. CONCLUSION

On the basis of the foregoing, Defendant Centex Homes' Motion for Summary Judgment (Docket Entry No. 14) is hereby DENIED. An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE